Tim **BOETTGER** and Becky Boettger, Individually; and as Next Friend for their Minor Daughter, Amanda Boettger, Plaintiffs,

v.

Otis R. **BOWEN,** Secretary, U.S. Dept. of Health and Human Services, and C. Patrick Babcock, Director, Michigan Dept. of Social Services, Defendants.

No. 87–CV–10319–BC.

United States District Court,
E.D. Michigan, N.D.

May 15, 1989.

Janet L. Parker, Asst. U.S. Atty., Bay City, Mich., and John M. Konwinski, Asst. Atty. Gen., Social Services Dept., Lansing, Mich., for defendants.

## MEMORANDUM OPINION

CHURCHILL, Chief Judge.

This case, which involves challenges to federal and state entitlement policies and regulations, is before the Court on cross-motions for summary judgment.[1] Since the Court concurs with Plaintiffs' assertion that the federal regulation and state policies at issue contradict 42 U.S.C. § 602(a)(19)(F), Plaintiffs' motion for summary judgment will be *granted* with respect to Counts I and III. Accordingly, the federal defendant's motion for summary judgment will be *denied*. The Court declines to consider whether the challenged state regulations conflict with state statutes, and therefore will *dismiss* Count II *without prejudice*.

### I. Factual Setting

Plaintiffs, Tim and Becky Boettger and their seven-year old daughter Amanda, live in Gratiot County, Michigan. Prior to February, 1987, the Boettgers were receiving benefits under the Aid to Families with Dependent Children–Unemployed Parent ("AFDC–U") program. On February 14, 1987, Mr. Boettger obtained, on his own initiative, a job with Medco Tree Service. He voluntarily terminated his employment on February 16, 1987. Thereafter, the Michigan Department of Social Services ("DSS") notified plaintiffs that because Mr. Boettger quit his employment without "good cause," the family's AFDC–U benefits would be terminated for a three-month period in accordance with state policies.

In this three-count complaint, Plaintiffs allege (1) that state policies contradict 42 U.S.C. § 602(a)(19)(F); (2) that state policies violate state legislation; and (3) that a federal regulation contravenes federal stat-

Jacqueline Doig, Legal Services of Eastern Michigan, Midland, Mich., and Edward J. Hoort, Legal Services of Eastern Michigan, Flint, Mich., for plaintiffs.

---

1. On September 16, 1988, the state defendant filed a document "adopting" the federal defendant's motion for summary judgment and accompanying memorandum. *See* Defendant Michigan Department of Social Services' Response to Plaintiffs' Motion for Summary Judgment (Docket # 59). The Court construes this filing as the state defendant's response to plaintiffs' motion for summary judgment, rather than a separate motion for summary judgment.

utory provisions. In light of the purported invalidity of the state policies and federal regulation, Plaintiffs assert that their AFDC benefits were wrongfully terminated. Plaintiffs seek declaratory and injunctive relief.

## II. The Federal Programs at Issue—AFDC, AFDC–U, and Work Incentive

The Aid to Families with Dependent Children ("AFDC") program, established in 1935, is designed to provide assistance to families headed by single parents so that the parents can care for their children at home without having to go to work. In 1961, Congress authorized the AFDC–U program to provide benefits to two-parent families in which the primary wage earner is unemployed. See Pub.L. No. 87–31, 75 Stat. 75 (codified at 42 U.S.C. § 607). Congress enacted the work incentive program, as an adjunct to AFDC and AFDC–U, in 1967. Pub.L. No. 90–248, § 204, 81 Stat. 821, 877 (codified at 42 U.S.C. § 630 et seq.). This statute authorized the federal secretary of labor, in conjunction with appropriate state officials, to establish work incentive programs (generically referred to as "WIN" programs) in each state. See 42 U.S.C. § 632(a). Such WIN programs were to include (1) a program placing as many individuals as possible in employment and utilizing on-the-job training for others; (2) a program of institutional and work experience training; and (3) a program of public service employment. See 42 U.S.C. § 632(b). Each state, moreover, remained free to add further components to its respective WIN program. See id.

Under the federal work incentive statute, state welfare agencies were to refer certain AFDC recipients (known as "mandatory WIN registrants") for participation in a state's WIN program. The statute also included a sanction provision, under which a mandatory WIN registrant's "refus[al] without good cause to participate under a work incentive program ... or ... refus[al] without good cause to accept employment" would be reported back to the state welfare

agency. See 42 U.S.C. § 602(a)(19)(F). Unless the registrant returned to a WIN program within sixty days (during which the registrant would receive counseling), his or her AFDC benefit payments would be terminated. See S.Rep. No. 744, 90th Cong., 1st Sess., reprinted in 1967 U.S.Code Cong. & Admin.News 2834, 2860.

In 1980, the federal work incentive statute was amended "to provide additional encouragement for welfare recipients to move into employment." See S.Rep. No. 408, 96th Cong., 2d Sess. 63, reprinted in 1980 U.S.Code Cong. & Admin.News 1277, 1341. Participation in a work incentive program became a condition for continued eligibility to receive AFDC and AFDC–U benefits. See Pub.L. No. 96–265, § 401, 94 Stat. 460–61. In addition, the 60–day counseling period, during which benefits would not be terminated, was eliminated. Id. The circumstances under which the sanction could be imposed remained the same: (1) "refus[al] without good cause to participate under a work incentive program;" and (2) "refus[al] without good cause to accept employment[.]" 42 U.S.C. § 602(a)(19)(F).

In 1981, the Department of Labor ("DOL") and the Department of Health and Human Services ("DHHS") promulgated the federal regulation at issue in this case. See 45 C.F.R. § 224.51. Under the regulation, sanctions are imposed when a mandatory WIN registrant is found to have "failed or refused without good cause to participate in the program or has terminated employment or has refused to accept employment or reduced earnings without good cause[.]" Id. (emphasis added). The regulation, therefore, added two grounds for imposing sanctions, i.e., termination of employment and reduction in earnings, not specifically mentioned in the original WIN statute or in the 1980 amendments.

## III. The State Program at Issue—MOST

Michigan's WIN program[2] is the Michigan Opportunity Skills Training ("MOST")

---

**2.** More accurately, the MOST program is Michi-
gan's WIN demonstration program. See 42 U.S.

program. The Michigan Department of Social Services ("DSS") administers MOST pursuant to written policies incorporated in a Service Manual and a Program Eligibility Manual. Under DSS policy, a mandatory MOST registrant will be sanctioned through reduction or termination of AFDC benefits if he "repeated[ly] fail[s] to participate in a work/training assignment" or "overt[ly] refus[es] to participate" in MOST without good cause. *See* Service Manual, Item 402, pp. 8–9; Program Eligibility Manual, Item 230, pp. 11, 15. Examples of refusing to participate in MOST include "voluntarily quit[ting] a job, whether or not it was obtained through MOST program participation" and "reduc[ing] his/her hours of employment." Service Manual, Item 402, pp. 9–10. Thus, the state policies provide for the imposition of sanctions under circumstances, *i.e.*, voluntarily quitting a job or reducing hours of employment, not expressly included in the federal statute.

## IV. Analysis of the Federal Regulation

 Plaintiffs attack 45 C.F.R. § 224.51 as inconsistent with the language and intent of 42 U.S.C. § 602(a)(19)(F). *See K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, ——, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313, 324 (1988) ("In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the language of the statute."). The statute at issue in this case provides for the imposition of sanctions when a mandatory WIN registrant is found "to have refused without good cause to participate under a work incentive program ... or to have refused without good cause to accept employment." 42 U.S.C. § 602(a)(19)(F). The fundamental issue before this Court, apparently one of first

impression, is whether the terms used in the federal regulation—"terminated employment" and "reduced earnings"—are consistent with the statutory phrases "refused ... to accept employment" and "refused ... to participate under a work incentive program." This inquiry, however, is narrowed by the promulgating agencies' explanation that the additional terms were included "since such actions are, as a practical matter, equivalent to a *refusal to accept employment.*" *See* 46 Fed.Reg. 48,-647 (1981) (emphasis added). Thus, the issue before the Court is limited to whether the terms used in the regulation are consistent with the single statutory phrase "refused ... to accept employment."

### A. The Plain Meaning of the Statute

In construing a statute in a case of first impression, a court looks initially to the language of the statute itself, and then to the statute's legislative history. *See United States v. Dadanian*, 818 F.2d 1443, 1448 (9th Cir.1987). That is, the plain meaning of the statutory words controls, unless there is a clearly expressed legislative intent to the contrary. *See Bradley v. Austin*, 841 F.2d 1288, 1293 (6th Cir.1988); *see also Lynch v. Lyng*, 872 F.2d 718 (6th Cir.1989) ("The most basic tenet of statutory construction holds that courts are required, where possible, to give words their plain, unambiguous meaning.").

In this case, the plain meaning of the various words suggests that "refuse to accept" is *not* the equivalent of "terminate" and "reduce." As a matter of logic and common understanding, one cannot terminate or reduce something that one has not accepted. Acceptance is a precondition to termination or reduction. Thus, a refusal to accept is a precursor to, *not* the equivalent of, a termination or a reduction.[3]

C. § 645 (granting states authority to operate WIN demonstration programs in order to "demonstrat[e] single agency administration of the work-related objectives of [WIN]"). The statutory provision at issue in this case, 42 U.S.C. § 602(a)(19)(F), is applicable to both WIN and WIN demonstration programs.

**3.** This distinction is also reflected in the dictionary definitions of the words. "Accept" is de-

fined in anticipatory terms that suggest a precondition ("to *undertake* the responsibility of"), whereas "terminate" and "reduce" are defined in conclusory terms ("to bring to *end, ...* to *discontinue;*" "to *diminish* in size, amount, extent, or number."). *See Webster's New Collegiate Dictionary* (9th ed. 1985); *see also Mallard v. United States Dist. Court*, —— U.S. ——, ——, 109 S.Ct. 1814, 1816, 104 L.Ed.2d 318 (1989) (using *Webster's* to interpret statutory term "request").

Moreover, "in ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *See K-Mart Corp.*, 486 U.S. at ——, 108 S.Ct. at 1817, 100 L.Ed.2d at 324. It is common ground that when Congress includes particular language in one section of an act but omits it in another section of the same act, Congress is presumed to have acted intentionally and purposely; language should not be implied where it has been excluded. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *Arizona Elec. Power Co-op, Inc. v. United States*, 816 F.2d 1366, 1375 (9th Cir.1987); 2A N. Singer, Sutherland Statutory Construction § 47.23 (4th ed. 1984).

When Congress enacted the work incentive program and the concomitant sanction provision in 1967, it also established procedures for determining AFDC eligibility and for calculating benefit amounts. *See* Pub. L. No. 90–248, § 202, 81 Stat. 821, 881 (codified at 42 U.S.C. § 602(a)(8)(B)). As a general rule, if an AFDC recipient finds gainful employment, his or her eligibility and benefit amounts are adversely affected. To ameliorate this employment disincentive, Congress provided that certain amounts of earned income would be "disregarded." Yet Congress specifically provided that this earned income exclusion would *not* apply if the wage earner "(i) terminated his employment or reduced his earned income without good cause ...; [or] (ii) refused without good cause ... to accept employment in which he is able to engage." *Id.* If Congress had intended the phrase "refused ... to accept employment" to encompass "terminated his employment" and "reduced his earned income," it would not have listed the phrases separately. In light of the plain meaning of the terms, therefore, the Court finds that the terms used in the regulation—"terminated employment" and "reduced earnings"—are beyond the ambit of the statutory phrase "refused ... to accept employment."

## B. The Statute's Legislative History

In promulgating 45 C.F.R. § 224.51, the federal agencies stated that "Congress intended in the 1980 amendments to permit fixed sanction periods to be imposed for those individuals who without good cause fail or refuse to participate *or terminate* or refuse to accept *employment or reduce earnings.*" 46 Fed.Reg. 48,647 (1981) (emphasis added). Indeed, the agencies expressed their belief that the additional terms were, "as a practical matter," the same as refusing to accept employment. *Id.*

The 1980 amendments to the work incentive program, however, did *not* alter the statutory grounds for imposing sanctions. The legislative history both in 1967 and in 1980 is deafeningly silent with respect to any circumstances other than refusing to accept employment and refusing to participate that warrant the imposition of sanctions. *See* S.Rep. No. 744, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Admin.News 2834, 3122 (stating that when "an individual refuses without good cause to accept employment or participate in a project," such conduct is sanctionable); S.Rep. No. 408, 96th Cong., 2d Sess. 63, *reprinted in* 1980 U.S.Code Cong. & Admin.News 1277, 1341 ("[A]n individual will not be eligible for assistance in the case of a refusal without good cause to participate in a WIN program or accept employment."). Contrary to the agencies' representation, the relevant legislative history is bereft of any indication that Congress ever intended to expand the grounds for imposing sanctions to include termination of employment or reduction in earnings. The legislative history, therefore, buttresses the conclusion that the terms "terminated employment" and "reduced earnings" are inconsistent with the statutory phrase "refused ... to accept employment." Accordingly, Plaintiffs' motion for summary judgment will be *granted* with respect to Count III, and the federal defendant's motion for summary judgment will be *denied.*

## V. *Analysis of the State Policies*
### A. Conflict with Federal Statute

█ While the federal sanction regulation was promulgated to amplify the statu-

tory expression "refused without good cause to accept employment," *see* Fed.Reg. 48,647 (1981), Michigan's sanction policies were derived from the federal statutory phrase "refused without good cause to *participate under a work incentive program.*" *See* Service Manual, Item 402, pp. 9–10. The Court, therefore, must determine if Michigan's use of the terms "voluntarily quits a job, whether or not it was obtained through MOST participation" and "reduces hours of employment" is consistent with this statutory phrase. *See King v. Smith*, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 2141 n. 34, 20 L.Ed.2d 1118 (1968) ("There is of course no question that ... any state law or regulation inconsistent with [federally imposed] terms and conditions is to that extent invalid.").

The congressional language defines a work incentive program as follows:

Work incentive programs

To the extent practicable and where necessary, work incentive programs established by this part shall include, in addition to the regular counseling, testing, and referral available through the Federal–State Employment Service System, program orientation, basic education, training in communications and employability skills, work experience, institutional training, on-the-job training, job development, and special job placement and followup services, required to assist participants in securing and retaining employment and securing possibilities for advancement.

42 U.S.C. § 633(d). Thus, an AFDC recipient's failure to engage in any or all of these activities may well lead to the imposition of sanctions. *See* 42 U.S.C. § 602(a)(19)(F) (permitting the imposition of sanctions when a mandatory WIN registrant has "refused without good cause to participate under a *work incentive program* ") (emphasis added); *see also* 42 U.S.C. § 633(g) (noting that when a mandatory WIN registrant "refuses without good

cause to ... participate in a project under a [work incentive] program," the federal authorities shall notify the appropriate state agency).

Actions beyond the statutory definition of a "work incentive program," however, *e.g.*, obtaining self-initiated employment, cannot logically be construed as participation in a "work incentive program." Similarly, the cessation of such activity cannot logically be regarded as equivalent to a "refus[al] without good cause to participate under a work incentive program."

■ In this case, Mr. Boettger's employment with Medco Tree Service was secured without the direct assistance of MOST. His voluntary termination of this non-MOST job led to the imposition of sanctions. Since Michigan's policies permit imposition of sanctions for conduct beyond the pale of participation under a "work incentive program," as that phrase is defined in 42 U.S.C. § 633(d), the Court is persuaded on the basis of the plain meaning of the terms that Michigan's policies contravene 42 U.S.C. § 602(a)(19)(F).[4]

The work incentive program's legislative history also suggests that Michigan's policies are inconsistent with the federal statute. The avowed purpose of the work incentive program is to "furnish[ ] incentives, opportunities, and necessary services" in order for AFDC recipients to be employed in the regular economy. *See* 42 U.S.C. § 630. Furthermore, the 1980 amendments were designed "to provide additional encouragement for welfare recipients *to move into employment.*" *See* S.Rep. No. 408, 96th Cong., 2d Sess. 63, *reprinted in* 1980 U.S.Code Cong. & Admin.News 1277, 1341 (emphasis added). Yet Michigan's sanction policies serve to discourage AFDC recipients from pursuing employment opportunites by methods independent of the work incentive program regime—a result contrary to, not consistent with, the stated purpose of the work incentive program.

---

4. This determination, however, should not be construed as suggesting that a state's WIN program cannot exceed the scope of the federal statute. A state may quite properly add further components to its WIN program. *See* 42 U.S.C.

§ 632(b). The Court merely concludes that a state cannot impose *sanctions* for reasons inconsistent with those outlined in 42 U.S.C. § 602(a)(19)(F).

Accordingly, Plaintiffs' motion for summary judgment as to Count I will be *granted*.[5]

## B. Conflict with State Legislation

In Count II of their complaint, Plaintiffs assert that the Michigan policies at issue in this case violate provisions of 1986 Mich. Pub.Act 134. *See* Complaint ¶¶ 58, 59. Since resolution of this allegation strictly involves questions of state law, the Court will *dismiss* Count II *without prejudice. See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed. 2d 218 (1966); *see also Strachman v. Palmer,* 177 F.2d 427, 431 (1st Cir.1949) ("Federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation.").

---

**5.** The Court also finds unpersuasive the federal defendant's argument that the secretary of DHHS could, pursuant to 42 U.S.C. § 1315(a), permit Michigan to sanction individuals who voluntarily terminate their employment. Quite simply, an administrative agency cannot authorize conduct that contravenes the express language of federal statutory provisions. *See Lynch v. Lyng,* 872 F.2d 718 (6th Cir.1989).